[Cite as *Skorvanek v. Ohio Dept. of Rehab. & Corr.*, 2016-Ohio-8328.]

| | |
|---|---|
| JOHN M. SKORVANEK | Case No. 2014-00845 |
| Plaintiff | Magistrate Robert Van Schoyck |
| v. | <u>DECISION OF THE MAGISTRATE</u> |
| OHIO DEPARTMENT OF<br>REHABILITATION AND CORRECTION | |
| Defendant | |

{¶1} Plaintiff was at all times relevant an inmate in the custody and control of defendant at the Pickaway Correctional Institution (PCI). Plaintiff brings this action claiming that defendant was negligent in failing to prevent an attack upon him by another inmate, Scott Creech, on November 12, 2013. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶2} Plaintiff testified at trial that he arrived at PCI in December 2011, serving a prison term for drug and alcohol-related offenses. (Plaintiff also acknowledged that more recently he served another prison term in Kentucky for a drug-related offense.) Plaintiff, who explained that he was paralyzed in an automobile accident, testified that when he came to PCI he was placed in the Frazier Health Center, a nursing facility for disabled or chronically ill offenders.

{¶3} Plaintiff related that when he came to Frazier Health Center, he recognized Creech because many years earlier, around 1989, they were both incarcerated at the Allen Correctional Institution. Plaintiff stated that he and Creech, who were placed just two or three beds apart from one another, made small talk and reminisced about playing softball at Allen, and plaintiff came to learn that Creech had arrived at Frazier Health Center just a few days before he did. Throughout most of the time that they lived in the facility, plaintiff stated, he and Creech were on friendly terms and regularly socialized,

having only minor disagreements at times about what to watch on television. Plaintiff recalled that he often brought coffee to Creech and that they played chess together a couple of times. According to plaintiff, very few of the other inmates would talk to Creech, and plaintiff took some pity on him. By plaintiff's description, Creech would talk about other inmates in a disparaging or hostile manner from time to time, and plaintiff stated that he intervened to diffuse a couple of situations where Creech was especially upset, but plaintiff stated that he never knew of Creech to physically act out on his frustrations or dislike of others.

{¶4} Plaintiff testified, though, that as time went on Creech became more antisocial. Plaintiff recalled that Creech grew despondent over the fact that defendant would not provide him with a knee replacement. Plaintiff also recalled that Creech, who is white, expressed racist sentiments and increasingly wanted to be moved to a different bed because he wanted to get away from the inmate in the next bed over, a black inmate named Hines. Plaintiff stated that in addition to having a walker and a wheelchair, Creech had a metal cane, and there were times when Creech would tap on the cane and remark how it could be used as a weapon. But, plaintiff admitted that he never told any staff members what Creech said about the cane.

{¶5} Plaintiff testified that Creech eventually told him he was thinking about doing some harm to Hines. Plaintiff stated that he was concerned enough about the conflict between Creech and Hines that he mentioned it to the nursing staff and suggested that one of the inmates be moved to another bed. Plaintiff's recollection was that Hines ended up going to another medical facility in Columbus by the time the incident at issue in this case occurred.

{¶6} By plaintiff's description, Creech became more withdrawn and barely said anything, and he did not make much sense when he did speak. Plaintiff remembered Creech telling him that he thought the nurses were talking about him. Plaintiff testified that another inmate, Donnie Waldroop, informed him in October or November 2013 that

Creech said something to the effect that he thought plaintiff was having him followed or surveilled, and that he was thinking about harming plaintiff.  Plaintiff stated that Creech completely stopped talking to him about 15 days before the attack, but plaintiff stated that it did not concern him much.   As plaintiff stated, Creech never personally threatened him, and in spite of what Waldroop told him, he was not in fear that Creech would actually attempt to harm him.  Testifying about Creech and the eventual attack, plaintiff "never thought his actions would lead to this."  Plaintiff admitted that he never told any of the staff about what he heard from Waldroop, nor could he recall telling any of the staff that Creech had stopped speaking to him.  Plaintiff also acknowledged that he never told the unit manager of any concerns about Creech, nor did he ever submit any written complaint or correspondence to any staff members about Creech.

{¶7} Describing the incident, plaintiff testified that a little after 7:00 a.m. on November 12, 2013, he was asleep in bed, lying on his back, and his mouth was open. Plaintiff stated that he was suddenly awakened by a burning sensation in his throat and face, and he was so startled that he thought the building had been struck by a plane. Plaintiff testified that when he rolled over and tried to get up, he received a blow to the forehead.  According to plaintiff, he could barely see at first due to the burning sensation in his eyes, but once he was able to open his eyes he observed Creech standing beside the bed and he heard a nurse yell "Creech, put that down."

{¶8} Surveillance video shows that Creech had filled a mug with water and microwaved it for approximately four minutes, and then Creech rolled his wheelchair over to plaintiff's bed and suddenly poured the water in plaintiff's mouth and face before striking plaintiff in the head with a cane.  (Plaintiff's Exhibit 9.)

{¶9} Plaintiff recalled staff rushing to the scene and Creech being restrained. Plaintiff testified that ice packs were placed on him at first, and then he was wheeled out to a nursing station, where his clothes were removed.  Plaintiff described feeling the

skin around his neck peel away when the clothes were removed. Plaintiff stated that an ambulance transported him to the Ohio State University Medical Center for treatment.

{¶10} Inmate Donnie Waldroop testified by way of deposition.[1] (Plaintiff's Exhibit 11.) Waldroop, who knew Creech only by the nickname Squeaker, stated that he remembered when plaintiff and Creech arrived at Frazier Health Center around the same time as one another, and to him it seemed like they socialized a lot and were good friends. Waldroop remembered that there was one time when Creech told him "he was going to get" plaintiff, and Waldroop got the impression that Creech may have become jealous about how many friends plaintiff had made. Waldroop also recalled plaintiff telling him about a month before the incident that he thought Creech was "up to something," acting weird, and turning away from plaintiff. But, according to Waldroop, no one took Creech very seriously and he was not aware of anyone ever telling staff of any concerns about Creech. Plus, as Waldroop explained, he understood that plaintiff and Creech had known one another for many years. Waldroop also stated that from his own interactions with Creech, such as one time when Creech gave him a Bible as a gift, he thought Creech was a decent person. Reflecting on what ultimately happened, Waldroop testified that from everything he knew he "would never have dreamed of it happening."

{¶11} Waldroop stated that he was lying awake in bed, next to plaintiff's bed, when he saw Creech roll his wheelchair from the microwave toward the beds. Waldroop related that he thought nothing of it, as inmates used the microwave all the time to heat water for making coffee. Waldroop recounted that when Creech commenced to pour the water on plaintiff, Creech said "it was for something [plaintiff had] done or something." Waldroop testified that he got out of bed and was going to restrain Creech, but it was all over within seconds as Nurses Heather Hagan and Lisa

---

[1]The objections raised in the deposition transcript at pages 13 and 30 are OVERRULED.

Copeland ordered Creech to stop and Corrections Officer Debra Long and other officers ran to the scene.

{¶12} Inmate George Borgmann testified by way of deposition.[2]    (Plaintiff's Exhibit 12.)  Borgmann, who stated that he moved to Frazier Health Center in February 2013 and was assigned to a bed near plaintiff's, testified that Creech "wasn't all there," that he was a "nut," and that he always thought people were talking about him or looking at him funny.  The way Borgmann described, Creech had a habit of rolling up in his wheelchair and telling other inmates threatening things or complaining that people were talking about him, and he recalled hearing Creech say about a month or two before the attack that he disliked plaintiff and was "going to get [plaintiff] for talking about me." Borgmann testified that he has spent more than 40 years in prison and in his experience the things that Creech would say were the type of "normal, idle threats" that inmates make all the time, and when Creech would say things like that to him, he just told Creech to go away.  Still, Borgmann testified that he had seen Creech use his cane before to strike some weaker old men in the bathroom.

{¶13} Borgmann stated that he never told the staff about anything Creech had said or done, and while he speculated that other inmates might have talked to a sergeant about Creech, he admitted that he did not know what was said and that he could not identify anything specifically about Creech that was ever brought to the attention of the staff.  Indeed, Borgmann made clear that he limits his interactions with everyone and keeps to himself.

{¶14} When the incident took place, Borgmann testified, he was awakened by the sound of screaming and when he looked up he saw Creech hitting plaintiff with a cane, at which point Nurse Hagan ran in and broke it up.

{¶15} Heather Hagan testified that she is employed with defendant as a registered nurse and has worked at PCI for over ten years.  Hagan explained that

---

[2]The objections raised in the deposition transcript at pages 16 and 29 are OVERRULED.

Frazier Health Center is home to inmates with a variety of medical issues, including inmates with end-stage diseases, inmates recovering from surgery, and inmates with limited or declining physical abilities. As Hagan related, there are five levels of security classifications for inmates in defendant's custody, and inmates with levels one through three are permitted at Frazier, while the higher security inmates at levels four and five must go to the Franklin Medical Center in Columbus if they need this sort of specialized care.

{¶16} Hagan testified that she was acquainted with plaintiff and Creech, and as far as she could recall both of them had been assigned to beds near one another in the west bay of Frazier Health Center throughout their time there. According to Hagan, plaintiff never told her about any concern for his safety or any desire to be separated from Creech, nor did Creech ever indicate to her that he might harm someone, and she was shocked by what occurred. Hagan described a protocol that the nursing staff follows when an inmate says he is going to hurt himself or others, in which case security is contacted and the inmate is placed under constant watch, and similarly when an inmate says he is scared for his safety the nurse will take the inmate to security. Hagan stated that in addition to speaking with staff, inmates have the ability to communicate with staff by the institutional "kite" system of written correspondence, and they can file informal complaints through the institutional grievance process. Regarding the fact that Creech had a cane, Hagan testified that in 2013 inmates at Frazier Health Center were only allowed to have a cane pursuant to a doctor's order, which Creech had. Hagan also testified that microwaves have been available for inmate use since the facility opened, and inmates use them frequently throughout the day.

{¶17} When the incident began, Hagan stated, she was in the "chart room," which connects the east bay to the west bay. Hagan testified that upon hearing Nurse Copeland yelling from the west bay, she immediately ran that way and saw Copeland pointing at the disturbance. Hagan stated that she saw Creech standing with a cane

raised over his head, but she did not see him strike plaintiff. By Hagan's account, she ordered Creech to drop the cane and she got in between Creech and plaintiff, and at that time Creech dropped the cane. Hagan related that Corrections Officer Long then arrived, followed by several other security staff members, including a Sergeant Byrum. Hagan, who recalled that plaintiff's upper body was wet and that there was a gash on his head, testified that she prepared an incident report afterward. (Plaintiff's Exhibit 4.)

{¶18} Lisa Copeland testified that she is employed with defendant as a licensed practical nurse and has worked at PCI for more than seven years. From Copeland's recollection, no inmate ever came to her before this incident and expressed concern about Creech's behavior, nor was she aware of any other nurses having problems with Creech.

{¶19} Copeland recalled that she was making rounds from bed to bed for the morning pill call in the west bay, and she had just looked up toward a television on the wall when she saw Creech standing up with his cane in the air. Copeland stated that plaintiff yelled "oh my God, oh my God" and then Creech struck plaintiff in the head with the cane. Copeland testified that she yelled at Creech, at which point Nurse Hagan and then Corrections Officer Long ran to the scene, and she activated her "man down" alarm, which caused other officers to respond. Copeland recalled that Hagan was the first one to attend to plaintiff, and there were health aides who came in to assist. Copeland explained that she was not able to leave her pill cart unattended, but when Hagan asked for some gauze she was able to push the cart over and help. Copeland remembered that plaintiff was bleeding and his clothes were wet. Afterward, Copeland stated, she filled out an Incident Report. (Plaintiff's Exhibit 5.)

{¶20} Debra Long testified that she is now employed with defendant as a licensed practical nurse at PCI, but from 2009 to 2011 she worked as a health aide in Frazier Health Center and from 2011 to 2016 she worked there as a corrections officer. As a corrections officer at that time, Long stated, she was responsible for providing

security throughout the facility, and she had to make rounds every 25 to 30 minutes through the three bays (west, east, and north) which each had several rows of beds in them. Long explained that the officers' desk was in a central area between the bays. Long testified that from the desk she could see through windows into the bays, which altogether housed about 160 inmates at that time. Long indicated that inmates were free to come up and talk to her, but that she never heard any complaints about Creech before the attack, and she was not able to remember there ever being a prior inmate-on-inmate altercation in the facility. Long also indicated that she had never before known of an inmate to use hot water as a weapon, and she stated that inmates had been using microwaves extensively since Frazier Health Center opened in 2009.

{¶21} On the day of the incident, Long stated, she worked the first shift, from 6:00 a.m. to 2:00 p.m. Corrections officers are supposed to record when they make their rounds in a log book, Long explained, and she authenticated a copy of a page from the log book showing that she made rounds that morning at 6:02 a.m., 6:31 a.m., and 7:00 a.m. (Defendant's Exhibit B.) As Long testified, the log book also includes a note from her at 7:12 a.m. to document that the man down alarm had been activated. When shown the surveillance video where Creech can be seen waiting by the microwave while the water is being heated, Long identified herself, and the video shows that she walked past Creech at that time, apparently while making rounds.

{¶22} Long testified that she was walking through the chart room just off the west bay when she heard Nurse Copeland yell. Long stated that she immediately ran into the west bay and saw Creech standing by plaintiff's bed, and she put Creech in handcuffs.

{¶23} Meredith Rinna testified that she is employed with defendant as the Mental Health Administrator at the Toledo Correctional Institution (ToCI), where she has worked in various roles for approximately 15 years. Rinna stated that in her current role

she spends some of her time treating inmates with mental illness, and as a licensed independent social worker she is entitled to render mental health diagnoses.

{¶24} Rinna testified that she is experienced in reviewing inmate mental health files, and she explained that there is such a file for every inmate whether or not the inmate is actually on the mental health caseload. As Rinna related, every inmate receives both a medical and a mental health evaluation when entering defendant's custody, and there are also similar evaluations performed when inmates are transferred between institutions. Rinna testified that the information obtained in these routine evaluations goes into the inmate's mental health file and is used for diagnostic and other clinical purposes as may be necessary, but that the information is not used for purposes of inmate security classification.

{¶25} Rinna testified that inmates who are diagnosed as having a mental health issue are placed on the mental health caseload, and the mental health files for these inmates may be more extensive and include documents such as screenings, diagnostic assessments, progress notes, and treatment. Rinna explained that the documents in the mental health file are used by the mental health staff to guide their diagnosis and treatment of the inmate, and with the possible exception of some high-level prison officials, access to these documents is limited to only the mental health and medical staffs. Rinna testified that she reviewed Creech's mental health file, which was filed under seal by defendant, and that the records contained therein are the type used exclusively by the mental health staff for diagnosis and treatment.

{¶26} Rinna also testified that each inmate has a disciplinary file and she described the types of documents that this file may contain. Rinna authenticated a set of disciplinary records from Creech's file. (Plaintiff's Exhibit 10.) According to Rinna, every inmate who goes before the Rules Infraction Board (RIB) has some mental health assessments or other mental health information included within their disciplinary records, as mental health is taken into account in the RIB proceedings, and she

authenticated a set of documents pertaining to Creech that fall into this category. (Plaintiff's Exhibit 3.)  Rinna explained that all the documents in the disciplinary file, even those that relate to mental health, may be accessed by any of defendant's staff. As opposed to the documents in a mental health file that Rinna explained were not used for inmate classification purposes, she testified that the documents in a disciplinary file play a significant role in the inmate classification process.

{¶27} Rinna stated that her first contact with Creech came in 2008, when Creech was an inmate at ToCI.  Rinna related that she was the Warden's Assistant at that time, so she would see Creech on a daily basis while making rounds throughout the institution.  Rinna stated that Creech left ToCI at some point and moved to PCI and Frazier Health Center, but he returned to ToCI after the incident in this case took place.

{¶28} Rinna testified that Creech has been in defendant's custody since 1981. Rinna stated that Creech's security classification was reviewed annually, and that in 2008 he was reduced to level two, and in 2009 he was reduced to level one, the lowest classification, and he remained at level one through the time this incident occurred.

{¶29} "To establish negligence, a plaintiff must show the existence of a duty, a breach of that duty, and injury resulting proximately therefrom."  *Taylor v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-1156, 2012-Ohio-4792, ¶ 15.  "In the context of a custodial relationship between the state and its prisoners, the state owes a common-law duty of reasonable care and protection from unreasonable risks."  *Jenkins v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-787, 2013-Ohio-5106, ¶ 8.  "The state, however, is not an insurer of inmate safety and owes the duty of ordinary care only to inmates who are foreseeably at risk."  *Franks v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 12AP-442, 2013-Ohio-1519, ¶ 17.  "Reasonable care is that degree of caution and foresight an ordinarily prudent person would employ in similar circumstances, and includes the duty to exercise reasonable care to prevent an inmate from being injured by a dangerous condition about which the state knows or

should know." *McElfresh v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 04AP-177, 2004-Ohio-5545, ¶ 16.

{¶30} "Where one inmate attacks another inmate, actionable negligence arises only when there was adequate notice of an impending attack." *Lucero v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-288, 2011-Ohio-6388, ¶ 18; *see also Frash v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 14AP-932, 2016-Ohio-360, ¶ 8. "Notice may be actual or constructive, the distinction being the manner in which the notice is obtained rather than the amount of information obtained." *Watson v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 11AP-606, 2012-Ohio-1017, ¶ 9. "Whenever the trier of fact is entitled to find from competent evidence that information was personally communicated to or received by the party, the notice is actual. Constructive notice is that notice which the law regards as sufficient to give notice and is regarded as a substitute for actual notice." *Hughes v. Ohio Dept. of Rehab. & Corr.*, 10th Dist. Franklin No. 09AP-1052, 2010-Ohio-4736, ¶ 14.

{¶31} Upon review of the evidence presented at trial, the magistrate finds as follows. In December 2011, plaintiff and Creech moved into Frazier Health Center and were assigned to beds near one another in the west bay of the facility. Plaintiff and Creech, who were first acquainted around 1989, were on good terms and regularly engaged in friendly conversation through at least the middle of 2013. Creech did not talk as much to other inmates, but he was known to sometimes talk about how he thought people were out to get him or that he simply did not like others, and his behavior was considered by some to be strange.

{¶32} A few weeks before the attack, Creech made comments to inmates Borgmann and Waldroop, who were assigned to beds close to plaintiff and Creech, to the effect that he was "going to get" plaintiff. Neither Borgmann nor Waldroop notified staff about these remarks. Borgmann thought it was just the sort of idle talk that is common in prison and which he heard from Creech on a number of occasions, and

Waldroop did not take Creech seriously and was completely surprised when Creech carried out the attack. Even though Waldroop mentioned the comments to plaintiff, and despite the fact that Creech stopped talking to plaintiff about 15 days before the attack, plaintiff did not take it as a serious threat and he did not notify staff about it. Plaintiff was not in fear of Creech attacking him, and when the attack did occur it was a surprise to plaintiff. Indeed, plaintiff and Waldroop "never" thought Creech would do something like that.

{¶33} Around 7:10 a.m. on November 12, 2013, Creech filed a mug with water and microwaved it for approximately four minutes, pausing briefly at one point to check the temperature of the water. Creech then rolled himself in his wheelchair toward the row of beds where he and plaintiff lived, he rolled up to plaintiff's bed and stood up, and he poured the hot water in the mouth and face of plaintiff, who had been asleep. As plaintiff started to rise up out of bed, Creech quickly picked up his cane and swung it twice at plaintiff's head, inflicting a wound to the forehead. Nurse Copeland, who was passing out medication nearby, immediately yelled at Creech and activated her man down alarm. At the same time, another inmate who can be seen in the video approached Creech and told him to stop. Nurse Hagan, having heard Copeland yell, ran in from the adjacent chart room and stood between Creech and plaintiff. Corrections Officer Long ran to the scene as well and immediately put Creech in handcuffs. After Long arrived, a sergeant and five more corrections officers also responded to the scene. Creech was removed from the area and plaintiff was provided with medical attention for the burns to his skin and other injuries, ultimately being sent out by ambulance to the Ohio State University Medical Center.

{¶34} The attack upon plaintiff appears to have been a senseless act of violence and the magistrate is sensitive to the serious injuries that plaintiff suffered. However, defendant did not have notice, either actual or constructive, that the attack was impending. From everything they knew, neither plaintiff, Borgmann, nor Waldroop felt

that Creech posed a serious threat, and none of them notified a staff member about any concern for plaintiff's safety. Considering the information known to the three of them and the fact that they were still surprised at the attack, it is difficult to say that defendant's employees, who knew nothing of the comments Creech made about plaintiff, should have foreseen the attack.

{¶35} While Borgmann testified that on some unidentified dates he saw inmates speaking with an unknown sergeant, Borgmann could only speculate whether those conversations concerned Creech, let alone what exactly was said. Plaintiff argues that the fact that defendant did not call the sergeant at trial suggests that defendant had something to hide, but plaintiff has the burden of proof in this case and had the ability to subpoena witnesses. The evidence adduced at trial simply does not establish that any threat to plaintiff's safety was conveyed to the staff. Plaintiff did notify staff at an earlier point in time that he was concerned Creech might harm inmate Hines, but his concern was specifically about the safety of Hines, whom Creech apparently disliked at least in part because of racial issues that played no role in the attack upon plaintiff.

{¶36} Plaintiff also contends that Creech had a disciplinary history and mental illness sufficient to put defendant on notice of an impending attack, but this is not borne out by the evidence. Borgmann testified that he had witnessed Creech strike an inmate with a cane in the restroom before, but even if that is true there is no evidence that the staff knew about Creech ever using his cane as a weapon, nor is there any evidence of him ever assaulting someone with hot water before. Plaintiff offered documents from Creech's disciplinary file dating back to the early 1980s, but the records do not remotely suffice to alert defendant to any likelihood of Creech's attack on plaintiff. For sure, Creech had been disciplined for a variety of infractions, but those infractions were accumulated over more than three decades in prison and nearly all of them were non-violent in nature. And, based upon annual reviews of Creech's security classification, he was considered to be at the lowest possible security level. There are records

evidencing that Creech was disciplined in 2002 for fighting with another inmate at the Lebanon Correctional Institution, and that he was disciplined in 2000 for attempting to strike another inmate with a lock attached to a belt at the North Central Correctional Institution over the theft of some cigarettes, but these incidents were remote in time—by more than ten years—from the attack on plaintiff and clearly do not constitute a pattern of violence that could even arguably confer defendant with notice that the attack by Creech was impending at any moment.

{¶37} As with every inmate in defendant's custody, there are mental health records for Creech. As was addressed on the record at trial, defendant filed a set of Creech's records under seal which are privileged, although plaintiff was able to obtain some non-privileged records related to Creech's mental health.[3] The evidence admitted at trial about Creech's mental health simply does not indicate that an attack by him was impending. The mere fact that Creech had received some mental health care or been diagnosed with depression, as noted in plaintiff's post-trial brief, is no basis to conclude that his attack was foreseeable. The testimony about Creech's behavior demonstrates that he was considered by some inmates to be odd or even a "nut," as Borgmann stated, but none of the witnesses feared him or thought his behavior suggested that he would carry out this attack on plaintiff, and there was no testimony about the staff having any behavioral problems with Creech.

{¶38} Plaintiff also argues that defendant was negligent in its supervision of the inmates at Frazier Health Center, but this is a facility housing around 160 sick or disabled inmates classified at the lowest security levels. The evidence does not demonstrate that any of defendant's policies or procedures for the supervision of the facility were violated, there was an officer's desk in the middle of the facility through which an officer could look through windows into the bays, officers made rounds

---

[3]Having reviewed the sealed records, it is the magistrate's conclusion that even if the privilege finding is later determined to have been in error, admitting the records into evidence would not change the outcome of the proceedings.

regularly and in fact Corrections Officer Long walked through the west bay just before the attack while Creech was at the microwave that was free for inmates to use, including heating water for hot drinks.   Until the moment that Creech rolled up and poured the water on plaintiff, Creech had not engaged in any prohibited act. Furthermore, Creech had a doctor's order allowing him to have the cane with which he struck plaintiff.   The attack was carried out within about seven seconds, Creech's misconduct was promptly detected, and the response from both the nursing staff and the security staff, which had Creech in handcuffs a little more than 30 seconds after he commenced the attack, was swift and effective.

{¶39} Based on the foregoing, the magistrate finds that plaintiff failed to prove his claims by a preponderance of the evidence.   Accordingly, judgment is recommended in favor of defendant.

{¶40} *A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i).   If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed.   A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

ROBERT VAN SCHOYCK
Magistrate

cc:

Richard F. Swope
6480 East Main Street, Suite 102
Reynoldsburg, Ohio 43068

Christopher L. Bagi
Eric A. Walker
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

**Filed November 16, 2016**
**Sent to S.C. Reporter 12/22/16**